# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 20-1314V
UNPUBLISHED

| | |
|---|---|
| MICHELLE WYLIE,<br><br>     Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: November 4, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza Vaccine;<br>Shoulder Injury Related to<br>Vaccine Injury (SIRVA) |

*Maximillian J. Muller*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Catherine Elizabeth Stolar*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On October 2, 2020, Michelle Wylie filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered from a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine she received on September 11, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. Although Ms. Wylie has been found entitled to compensation, the parties were unable to agree to damages.

For the reasons discussed below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of $111,406.49, representing

---

[1] Although this Decision has been deemed unpublished, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

$108,000.00 for actual pain and suffering, plus $3,406.49 in unreimbursed medical expenses.

## I. Relevant Procedural History

Approximately 14 months after this case was initiated, Respondent filed his Rule 4(c) Report on December 6, 2021, conceding that Petitioner was entitled to compensation. ECF No. 22. A ruling on entitlement was subsequently issued on December 7, 2021. ECF No. 23. On February 18, 2022, Petitioner filed a status report indicating that the parties had reached an impasse. ECF No. 27. The parties filed briefs setting forth their respective positions on pain and suffering - the only disputed damages element. ECF Nos. 29 ("Br."), 31 ("Opp."), and 32 ("Repl."). I subsequently proposed that the parties be given the opportunity to argue their positions at a motions hearing, at which time I would decide the disputed issues. ECF. No. 33. That hearing was held on October 28, 2022,[3] and the case is now ripe for a determination.

## II. Relevant Medical History

A complete recitation of the facts can be found in the Petition, the parties' respective pre-hearing briefs, and in Respondent's Rule 4(c) Report.

In brief summary, Ms. Wylie received an influenza vaccine in her left shoulder on September 11, 2019. Ex 3 at 10. Petitioner stated that while the injection itself was not painful, she experienced a "painful tingling sensation" by that evening and she could not lift her arm. Ex. 2 at ¶5.

On October 11, 2019 (30 days after her vaccination), Ms. Wylie presented to her primary care physician ("PCP") complaining of "intermittent" shoulder pain. Ex. 3 at 7. She rated her pain at 5/10. *Id.* On October 28, 2022, Petitioner presented to an orthopedist for evaluation. Ex. 4 at 28. She described "extreme pain" for the first two nights after her vaccination, continuing lesser pain, and very limited ROM. *Id.* She was diagnosed with bursitis and "SIRVA," prescribed meloxicam, and referred to physical therapy. *Id.* At 30.

Petitioner had a physical therapy evaluation on November 5, 2019. Ex. 5 at 3. She reported pain between 4/10 and 8/10 and difficulty performing daily tasks, including hair care, driving, and reaching into overhead cupboards. *Id*. Ms. Wylie attended a total of 14

---

[3] At the end of the hearing held on October 28, 2022, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

sessions of physical therapy through February 6, 2020. Ex. 5 at 3-73. Upon discharge, Petitioner's prognosis was "fair" and she was awaiting surgical intervention. *Id.* at 73.

Petitioner returned to her orthopedist for two follow-up appointments in December 2019. Ex. 4 at 31, 35. An MRI performed on December 27, 2019, revealed moderate subacromial bursitis; fraying of the posterior supraspinatus tendon; moderate tendinosis of the supraspinatus, infraspinatus, and subscapularis tendons; tenosynovitis of the biceps; and a tear of the glenoid labrum with moderate effusion. Ex. 4 at 5-6. After reviewing the MRI results, Petitioner had follow-up orthopedist appointments on January 6, 2020 and February 6, 2020. Ex. 4 at 3, 8. At the latter visit, Petitioner presented with a significant decrease in range of motion despite physical therapy. *Id.*

On May 6, 2020, Petitioner underwent left shoulder arthroscopy with lysis and resection of adhesions with manipulation, arthroscopic biceps tenotomy, and debridement of the rotator cuff. Ex. 7 at 5-6. She had post-surgery follow-up appointments with her orthopedist on May 12, 2020, and June 16, 2020. Ex. 4 at 21, 25.

After her surgery, Petitioner completed 18 physical therapy sessions prior to her discharge on July 9, 2020. Ex. 5 at 75-111; Ex. 8. At her fourth post-surgery session, Petitioner reported that she had returned to running two weeks after her surgery with only mild pain. Ex. 5 at 89. Upon discharge, she reported her improvement at 95%, with some remaining difficulty reaching overhead and behind her back. *Id.* at 77.

Although there are no treatment records filed for any period after July 9, 2020 (ten months after her vaccination), Petitioner states that she continues to have "slight discomfort" and weakness in her shoulder, which is aggravated with activity and for which she takes ibuprofen. Ex. 9 at ¶15.

### III. The Parties' Arguments

#### a. Petitioner

Ms. Wylie seeks $128,406.49, consisting of $125,000.00 as compensation for her pain and suffering, plus $3,406.49 for past unreimbursable medical expenses. Br. at 1. The parties agree on the amount for out-of-pocket expenses. *Id.*

Petitioner argues that her SIRVA injury caused her severe pain prior to her surgery, which did not improve with conservative treatment, including orthopedic treatment, prescription medication, and physical therapy. Br. at 7. After her arthroscopic surgery, Petitioner improved with additional physical therapy, but still had symptoms and difficulty

at discharge. Br. at 7-8. Petitioner states that she continues to experience pain at a level of 3/10 and "has difficulty sleeping and with recreational activities." Br. at 8.

During the hearing and in her brief, Petitioner discussed prior SIRVA cases that involved injured claimants with similar fact patterns, and argued that an award of $125,000.00 in pain and suffering was reasonable and appropriate given that her circumstances were comparable. Br. at 6-9.

### b. Respondent

Respondent maintains that a pain and suffering award of $67,500.00 is appropriate. Opp. at 1. Respondent contends that Petitioner's course of treatment was significantly milder than she admits, "especially when one considers her symptoms at first presentation, participation in pre-operative physical therapy, and excellent recovery following surgery." *Id*. at 7. Respondent argues that Petitioner reported extreme pain only the first few nights after vaccination and only intermittent discomfort when she presented to her PCP for treatment. *Id.* at 8. Respondent also notes that Petitioner never received any steroid injections for her pain. *Id.*

Respondent distinguishes Petitioner's cited prior SIRVA cases, arguing that both cased involved more severe injuries. Opp. at 8. Those petitioners sought treatment sooner, rated their pain higher, received steroid injections, were unable to participate in pre-surgery physical therapy, and had more severe deficits upon discharge. *Id.* In addition, Respondent also notes that Petitioner reported returning to running two weeks after her surgery with only mild pain, and recovery of 95% by the time she was discharged from physical therapy just over two months after her surgery. *Id.*

During the hearing and in his brief, Respondent discussed two prior SIRVA cases as the basis for his proposed pain and suffering award. Opp. at 11.

### IV.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section

15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## V.     Prior SIRVA Compensation Within SPU[5]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[6]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated Agreement**[7] |
|---|---|---|---|---|
| **Total Cases** | *88* | *1,223* | *28* | *967* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.     Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[8]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to

---

[7] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[8] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### VI. Appropriate Compensation in this SIRVA Case

#### a. Awareness of Suffering

Awareness of suffering is not typically a disputed issue in cases involving SIRVA – and it does not appear to be herein either. Neither party has argued that Ms. Wylie lacked awareness of her injury, thus, I find that Petitioner had full awareness of her suffering.

#### b. Severity and Duration of Pain and Suffering

With respect to the severity and duration of the injury, Petitioner's medical records and affidavits describe a moderate SIRVA injury. Petitioner sought treatment relatively quickly after her vaccination, and consistently reported pain levels above 4/10 prior to her surgery. Ex. 3 at 7; Ex. 4 at 28; Ex. 5 at 3-73. She was prescribed medications and completed 14 physical therapy sessions prior to her surgery. Ex. 4 at 28; Ex. 5 at 3-73.

Petitioner underwent successful surgery approximately eight months after her vaccination. Ex. 7 at 5-6. After her surgery, Petitioner's recovery was excellent. She attended 18 sessions of physical therapy and two follow up appointments with her orthopedist. Ex. 5 at 75-111; Ex. 4 at 21, 25; Ex. 8. She reported 95% recovery upon her

discharge from physical therapy, two months after surgery. Ex. 8 at 77. Her total course of treatment spanned approximately ten months.

After reviewing the record in this case and considering the parties' arguments during the hearing, I find that the overall injury, while somewhat moderate, was serious enough (especially since surgery was required) to justify a six-figure award. Petitioner cited two good comparable prior SIRVA cases (particularly *Vaccaro*), whereas Respondent's cases did not involve surgery. Certainly a number of factors (including the speed of treatment, the number of physical therapy sessions, the number of steroid injections, and the impact of an injury on the petitioner's employment and activities) bear on the determination of the severity of a SIRVA injury. But surgery is a particularly compelling justification for a higher award (especially since it more often than not occurs because more conservative treatments are not sufficiently ameliorative, and where a claimant has experienced pain and other unsuccessful interventions). Respondent's proposal fails to adequately account for the pain and suffering Petitioner experienced during and after her surgery. As a result, Respondent has not successfully defended his proposed pain and suffering award.

In addition to Petitioner's proposed comparable cases, I deem the present action factually similar to another recent case: *Issertell v. Sec'y of Health & Human Servs.*, No. 20-0099V, 2022 WL 2288247, (Fed. Cl. Spec. Mstr. May 17, 2022). In *Issertell*, the petitioner sought treatment 15 days after her vaccination. *Id.* at *2. She received a steroid injection, had chiropractic and acupuncture treatment, and had two PT sessions prior to surgery for her SIRVA. *Id.* at *2-4. Ms. Issertell's MRI showed a significant injury with partial thickness tears, bursitis, effusion, and tendinosis. *Id.* at 4. She had surgery seven months after vaccination, had 12 post-surgery PT sessions, and ended treatment ten months after vaccination with a good post-surgical recovery. *Id.* at *5-6. She was awarded $112,500 in pain and suffering. *Id*. at 10.

The degree of factual similarity between the treatment course of the *Issertell* petitioner and Ms. Wylie's course suggest an award of pain and suffering in the same range. However, my award will be somewhat lower, in light of several persuasive arguments made by Respondent, including the fact that Petitioner did not have any steroid injections, that her recovery after surgery was both excellent and swift, with 95% recovery after only two months, and that her total treatment course lasted only ten months.

Under such circumstances, and considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$108,000.00** in compensation for past pain and suffering is reasonable and appropriate in this case.

### c. Award for Past Unreimbursed Expenses

Petitioner requests $3,406.49 in past unreimbursable expenses. Br. at 9. Respondent does not dispute this sum, and therefore Petitioner is awarded this sum without adjustment.

## VII.   CONCLUSION

In light of all of the above, the I award **Petitioner a lump sum payment of $111,406.49,** (representing $108,000.00 for Petitioner's actual pain and suffering and $3,406.49 for unreimbursable medical expenses) **in the form of a check payable to Petitioner, Michelle Wylie.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

s/Brian H. Corcoran<br>
Brian H. Corcoran<br>
Chief Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.